# THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NORTHEASTERN DIVISION

| | |
|---|---|
| EDITH and GLEN HARBIN, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>FCA US LLC, a Delaware Limited Liability Company,<br><br>      Defendant. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br>Jury Trial Demanded |

Edith and Glen Harbin, ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this action against Defendant FCA US LLC ("FCA"). The following allegations are based upon investigation by Plaintiffs' counsel, upon information and belief, and upon personal knowledge as to Plaintiffs' own facts.

## I.     NATURE OF THE ACTION

1.     This case concerns the simple task of shifting a vehicle into Park. FCA has taken this simple process, traditionally straightforward and free from confusion, and implemented a defective and dangerous gear-shifting mechanism. In short, FCA replaced the traditional gearshift with a joystick and failed to consider the implications to consumer safety.

2.     FCA installed gearshifts in its 2014-15 Jeep Grand Cherokees, 2012-14 Dodge Chargers, and 2012-14 Chrysler 300 sedans (the "Defective Vehicles") that depart from the traditional "PRND" gearshift in favor of the Monostable electronic gearshift (the "E-shift System"). The E-shift System never truly shifts or locks into a gear position, in contrast to a

1

conventional gearshift, but instead remains in a centered or neutral position. As such, the E-shift System does not provide the tactical or visual feedback that drivers are accustomed to receiving from conventional gearshifts.

3.     For the almost one million individuals throughout the United States who drive the Defective Vehicles, the counterintuitive E-shift System has created an unreasonably dangerous risk that drivers will inadvertently fail to park their vehicles while the vehicle is still running. Because the E-shift System does not move into a detent like more traditional gearshift mechanisms, and because FCA has failed to provide a safety override that prevents drivers from exiting their vehicles before safely shifting into the Park position, hundreds of Defective Vehicle owners have reported their vehicles rolling away without a driver behind the wheel.

4.     The E-shift System should not pose an unreasonable safety hazard. In fact, many of FCA's competitors have safely and successfully implemented similar electronic gearshift assemblies that return to a neutral position, but those competitors also designed safety overrides that automatically shift the vehicle into Park if the driver's door is opened and the foot brake is released while the vehicle is still running. This safety override prevents the type of rollaway incidents that plague owners of the Defective Vehicles and illustrates the necessity of designing fail-safe mechanisms for unfamiliar new vehicle technologies.

5.     As a result of the defective E-shift System, the Defective Vehicles are unsafe upon purchase and pose an unreasonable risk of harm to drivers, passengers, and bystanders. The E-shift System has caused and will continue to cause significant damage to individuals and their property. Moreover, the defective E-shift System has reduced the value of the Defective Vehicles, and the loss in value will remain even if the E-shift System is eventually fixed.

## II.     PARTIES

6.     Plaintiffs are residents and citizens of Crossville, Cumberland County, Tennessee, and are the owners of a 2014 Jeep Grand Cherokee Limited Diesel.

7.     Defendant FCA US LLC ("FCA") is a limited liability company organized and existing under the laws of the State of Delaware, and is wholly owned by holding company Fiat Chrysler Automobiles N.V., a Dutch corporation headquartered in London, United Kingdom. FCA's principal place of business and headquarters is in Auburn Hills, Michigan.

## III.     JURSIDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d). The amount in controversy in this class action exceeds $5,000,000, exclusive of interest and costs, and Plaintiffs and some Class members are citizens of states other than where FCA is incorporated or has its primary place of business.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (d) because a substantial part of the events or omissions giving rise to the claims occurred in this District, FCA regularly transacts business in this District, and FCA has continuous and systematic contacts with this District through the marketing, distribution, sale, and warranting of the Defective Vehicles in Tennessee.

## IV.     FACTUAL ALLEGATIONS

### A.  FCA emphasizes its dedication to ensuring driver safety.

10.     FCA is a company that touts its dedication to ensuring driver safety. FCA views its "dedication to vehicle safety [a]s consistent with our commitment to being a good corporate citizen." For instance, on its website, FCA informs consumers that it has signed on to the Proactive Safety Principles, along with eighteen other automakers, to leverage their knowledge and

3

collaborate to enhance safety of the traveling public. FCA also emphasizes driver safety in advertisements and promotional materials distributed throughout the United States, including in Missouri. Some examples include:



# Jeep

Since 1941, the Jeep brand has
continued to deliver an open invitation to
live life to the fullest, providing
customers unique, versatile and capable
vehicles that provide owners a sense of
safety and security to handle any
adventure with confidence.

Chrysler was founded on the philosophy of design with purpose. To build revolutionary new cars - affordable luxury vehicles known for their innovative, forward-thinking engineering. And it is our purpose today and for tomorrow. .Our alliance with Fiat® Group now gives us the competitive advantage of access to new technologies and advanced engineering solutions that further our mission. Our beautiful purpose. To create the type of exciting, efficient, reliable, safe vehicles you expect and deserve.



ALWAYS ON GUARD

Accidents and road hazards rarely give you a heads-up before they strike. That's why this Jeep SUV packs more than 80 standard and available safety and security features to help keep drivers and passengers protected.

**B. Despite its purported dedication to consumer safety, FCA installed an unreasonably dangerous electronic gearshift system.**

11. Despite its purported dedication to driver safety, FCA nonetheless installed the E-shift System in the Defective Vehicles and created an unreasonably dangerous risk that drivers would suffer significant personal injury and property damage when their vehicles failed to properly shift into Park and began to rollaway without a driver behind the wheel.

12. The Defective Vehicles utilize an E-shift System developed and assembled by ZF Friedrichshaffen AG ("ZF"). ZF designed the E-shift System according to FCA's specifications, which FCA later incorporated into its vehicle designs and program interface:

> ZF supplies gearshift systems to automotive manufacturers according to their technical and design specifications. The manufacturer designs the integration of the gearshift system into the vehicle operating concept and develops the respective safeguard mechanisms. ZF delivered a fully functional state-of-the-art product, which was integrated into the vehicle architecture by the manufacturer.[1]

13. The E-shift Systems operate electronically. The gear requested by the driver is transmitted from the shifter via the Controller Area Network Bus to the Transmission Control Module, which then makes the requested shift. The Monostable gearshift does not, however, move into a detent like a traditional gearshift but instead springs back to a centered or neutral position after the driver selects a gear and releases the shifter. Thus, to change gears, the driver depresses a button on the shift lever and moves it to the desired gear position, then the lever springs back to a centered or neutral position. In other words, the E-shift System does not have a separate and identifiable position for each gear setting. The following is a picture of the E-shift System in a Jeep Grand Cherokee:

---

[1] http://jalopnik.com/fiat-chrysler-is-recalling-1-1-million-cars-because-peo-1772561060 (last accessed July 11, 2016).

6



14.     Importantly, the E-shift System logic allows drivers to exit a running vehicle despite the fact that the vehicle is still in gear. Although a chime sounds and a message displays to warn drivers who attempt to exit a running vehicle when the gearshift is not in Park, this feedback mechanism is insufficient to adequately alert the driver that the vehicle is running **<u>and</u>** still in gear. Furthermore, the E-shift System does not contain a safety override mechanism that prevents drivers from exiting an idling vehicle before it has been properly parked. Therefore, the Defective Vehicles contain a material defect, in part, because they do not possess a fail-safe mechanism that automatically places the car in Park when drivers attempt to exit the vehicle with the engine running and still in gear. Because the drivers can exit the running vehicle while it is still in gear, hundreds of owners have reported instances where unattended Defective Vehicles began to rollaway, resulting in significant personal injury and property damage.

**C.   The federal government initiated an investigation into the Defective Vehicles after receiving numerous reports of rollaway incidents.**

15. The United States Department of Transportation National Highway Traffic Safety Administration ("NHTSA") Office of Defects Investigation opened Preliminary Evaluation PE15-030 on August 20, 2015, to investigate the rollaway problem with the 2014 Jeep Grand Cherokee. NHSTA found that the E-shift System logic does not protect drivers who intentionally leave the engine running or drivers who do not recognize that the engine continues to run after an attempted shut-off.[2] According to NHTSA, the E-shift System "is not intuitive and provides poor tactile and visual feedback to the driver, increasing the potential for unintended gear selection."[3] The rollway issue is a significant safety threat because "[d]rivers erroneously concluding their vehicle's transmission is in the PARK position may be struck by the vehicle and injured if they attempt to get out of the vehicle while the engine is running and the parking brake is not engaged."[4]

16. NHTSA further found that the E-shift System "violates several basic guidelines for vehicle controls, such as: 1) be consistent; 2) controls and displays should function the way people expect them to function; 3) minimize what the user has to remember; and 4) operations that occur most often have the greatest impact on driving safely should be the easiest to perform."[5]

17. In total, NHTSA identified 306 incidents in which the Defective Vehicles began to rollaway after the drivers intended to shift the vehicle into Park. The rollaway issue has resulted in 117 reported crashes. Twenty-eight of the crashed reportedly caused injuries, including three individuals who suffered a fractured pelvis and four others who required hospitalization (from a ruptured bladder, fractured kneecap, broken ribs, and damaged right leg, respectively). Other

_____

[2] http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM497024/INOA-EA16002-6630.PDF (last accessed July 20, 2016).
[3] _Id._
[4] http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM514210/RCLRPT-16V240-3644.PDF (last accessed July 20, 2016).
[5] http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM528576/INCLA-EA16002-8352.PDF (last accessed July 11, 2016).

injuries included reports of a broken nose, facial lacerations requiring stitches, sprained knees, severe bruising, and trauma to legs.[6]

18. As just a few examples from the dozens listed in NHTSA complaint database:

One customer described two separate rollaway incidents involving his 2015 Jeep Grand Cherokee:

> I HAVE HAD 2 INCIDENTS RELATING TO THE VEHICLE NOT PROPERLY ENGAGING IN PARK, DUE TO THE ELECTRONIC SHIFT MECHANISM. IN ONE INSTANCE I EXITED THE VEHICLE ASSUMING IT WAS IN PARK AND THE VEHICLE WAS STILL IN GEAR. THE VEHICLE WAS IN MY DRIVEWAY, ROLLED FORWARD UNTIL STRIKING THE SIDE OF MY HOUSE. THIS CAUSED DAMAGE TO MY HOUSE AS WELL AS THE LEFT FRONT OF THE VEHICLE. IT WAS FORTUNATE THE VEHICLE WAS ANGLED TOWARDS THE HOUSE, OTHERWISE THE VEHICLE WOULD HAVE GONE THROUGH MY BACK YARD INTO ANOTHER PART OF OUR NEIGHBORHOOD. IN THE SECOND INSTANCE THE VEHICLE WAS JUST OUT OF MY GARAGE. AGAIN, I EXITED THE VEHICLE, THINKING IT WAS IN PARK. THE VEHICLE WAS ACTUALLY IN REVERSE. I EXITED THE VEHICLE AND IT STARTED TO ROLL BACK INTO MY GARAGE WITH THE DRIVER SIDE DOOR OPENED. I WAS ABLE TO QUICKLY JUMP BACK INTO THE MOVING VEHICLE AND APPLY THE BRAKES IN TIME TO STOP THE VEHICLE. IF I HAD NOT BEEN ABLE TO DO SO THE VEHICLE WOULD HAVE STRUCK THE SIDE OF MY GARAGE WITH AN OPEN DOOR.

Two customers described rollaway incidents involving their 2013 Dodge Chargers:

> THE CONTACT OWNS A 2013 DODGE CHARGER. THE CONTACT STATED THAT AFTER SHIFTING INTO THE PARK POSITION AND EXITING THE VEHICLE, IT INDEPENDENTLY ROLLED AWAY AND CRASHED INTO A TREE. THE AIR BAGS DID NOT DEPLOY. THE CONTACT WAS KNOCKED DOWN BY THE DOOR OF THE VEHICLE AND SUSTAINED BRUISING THAT DID NOT REQUIRE MEDICAL ATTENTION.

> TWICE I PULLED IN MY DRIVEWAY AND THOUGHT I PUT THE CAR IN PARK AND WENT TO GATHER MY THINGS BEFORE SHUTTING THE CAR OFF AND INSTEAD OF BEING IN PARK THE CAR CONTINUED FORWARD. THE FIRST TIME IT SCRAPED MY SIDE FENCE AND THE SECOND UNTIL IT HIT MY CHAIN LINK GATE- BENDING THE POSTS AND TAKING THE FENCE GATE OFF THE POSTS. THE FENCE GATE THEM PROCEEDED TO FALL ON TOP OF THE HOOD OF THE CAR.

---

[6]http://www.odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM497024/INOA-EA16002-6630.PDF (last accessed July 11, 2016).

BECAUSE I WAS GATHERING MY ITEMS OFF THE SEAT I DIDN'T
NOTICE THE CAR MOVING UNTIL I HEARD THE CRUNCHING SOUND.

Customers also described rollaway incidents involving their 2014 Chrysler 300 sedans:

THE CONTACT STATED THAT WHILE THE VEHICLE WAS IDLING IN
THE PARK POSITION, THE VEHICLE ROLLED AWAY INDEPENDENTLY.
AS A RESULT, THE VEHICLE CRASHED INTO TWO OTHER VEHICLES.

WHEN I PUT THE CAR INTO PARK, IT POPS INTO REVERSE. THEN I HIT
THE ENGINE OFF BUTTON, BUT SINCE IT IS IN REVERSE, THE ENGINE
STAYS ON. THEN I OPEN THE DOOR TO GET OUT, THINKING THE
ENGINE IS OFF AND THE CAR IS IN PARK, AND IT STARTS ROLLING
BACKWARD. THIS HAS HAPPENED 6 TIMES. THE CAR IS IN THE SHOP
NOW.

19.     A common theme emerges: many drivers believe they have properly pushed the

gear shift all the way to the Park position, but likely stopped at the Neutral or Reverse position.

The driver believes the transmission is in Park and hits the ignition button to turn the vehicle off

or intentionally leaves the vehicle idling. Because the vehicle is not actually in Park, however, the

engine continues to run regardless of whether the driver intended to turn it off. The engine is quiet,

the visual feedback is inadequate, and the driver fails to realize the vehicle is still running **and** in

gear. When the driver exits the vehicle, it begins to rollaway and turns into a freewheeling, forty-

five-hundred pound wrecking ball capable of inflicting catastrophic damage to everything and

everyone in its path.

###    D. Like its competitors, FCA should have (and could have) designed an electronic gearshift system that contained safety override protocols.

20.     These incidents could have been prevented. Other brands that use ZF electronic

gearshift systems, such as Audi, BMW, and Jaguar, design safety override protocols that

automatically place the vehicle in Park if the driver attempts to exit a running vehicle before it is

placed in the Park position. Some companies, including Toyota, have also developed electronic

shifters with more intuitive, user-friendly designs. The Toyota Prius has a shifter that returns to its

neutral position, but it also contains a button that must be pressed to shift the car into Park.[7]



FCA is more than capable of designing an electronic gearshift assembly to prevent the rollaway

problem. In fact, FCA's own Chrysler 200 sedan incorporated a transmission dial, pictured below,

that clearly indicates when a vehicle has been placed in Park.[8]

---

[7] http://cars.automotive.com/toyota/prius/2015/photos/interior/gearshift/t3-12-8/ (last accessed
July 12, 2016).
[8] http://www.chrysler.com/assets/images/Vehicles/2016/200/vlp/Features/Interior/2016-200-
interior-console.jpg (last accessed July 12, 2016)



The above-pictured designs are superior to the E-shift System because they unambiguously link user input to mechanical results—i.e., they provide the tactile and visual feedback drivers expect. A driver simply has to turn the knob completely to the left or push a button to shift into Park. In the Defective Vehicles, however, a driver who presses the gearshift forward could land in either Neutral, Reverse, or Park.

**F. FCA failed to promptly and adequately notify the Defective Vehicle owners of the rollaway issue.**

21.     Recognizing the significant safety risk posed by the defective E-shift System, FCA changed from the E-shift System to Polystable electronic gearshift assemblies in its 2015 Dodge Chargers, 2015 Chrysler 300 sedans, and 2016 Jeep Grand Cherokees. The Polystable gearshift

12

stays in the position of the selected gear, similar to standard mechanical shifters, providing drivers with the expected tactile and visual feedback.[9]

22.     Although FCA has finally recognized the danger posed by the E-shift System, as shown by the steps it has taken to protect future Fiat Chrysler vehicle owners from the same defective gearshift, FCA has displayed a significant degree of indifference toward the safety of current Defective Vehicle owners. FCA failed to promptly notify customers about this safety hazard through a recall program, opting to wait until eight months after NHTSA initiated its investigation into the E-shift System to commence a voluntary recall to address the rollaway issue.

23.     But this case does not present the first time FCA has been slow to recall dangerously defective vehicles. Rather, FCA has track record of failing to adequately notify vehicle owners about potential safety issues. For example, in 2013, FCA initially refused to recall 2.7 million Jeep SUVs, despite their link to more than 50 deaths in rear-end vehicle collisions. FCA's lack of compliance led NHTSA Administrator Mark Rosekind to voice the agency's "concerns about slow completion rates, slow or inadequate notifications to consumers, faulty remedies, improper actions by dealers and more"[10] related to 20 separate recalls that affected 10 million vehicles. "Each of these defects presents an unreasonable risk to safety and in each case there is reason to question whether Fiat Chrysler has met its legal obligations."[11]  FCA paid $105 million to NHTSA as a result of its recall issues, the largest penalty ever imposed on an automaker by the safety agency, with additional penalties also possible after FCA admitted to significantly underreporting the

---

[9] http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM528576/INCLA-EA16002-8352.PDF (last accessed July 11, 2016).
[10] http://www.freep.com/story/money/cars/chrysler/2015/05/18/fca-fiat-chrysler-jeep-recalls-nhtsa-public-hearing/27531875/ (last accessed July 11, 2016).
[11] *Id.*

number of death and injury claims linked to possible vehicle defects.[12] According to Mr. Rosekind, FCA's recall and reporting practices "represent[] a significant failure to meet a manufacturer's safety responsibilities."

24. Moreover, FCA knew from the moment the Defective Vehicles entered the market that they were dangerous and created an unreasonable risk of personal injury and property damage. Long before it initiated a voluntary recall, FCA had "received negative feedback for the Monostable shifters shortly after the subject vehicles entered the market," and "[f]ield data indicate[d] that the design result[ed] in higher error rates during attempted shifts to Park and higher rates of powered rollaway incidents."[13] FCA "determined that existing strategies built into these vehicles to deter drivers from exiting the vehicle after failing to put the transmission into PARK have not stopped some from doing so . . . FCA US has therefore determined that the absence of an additional mechanism to mitigate the effects of driver error in failing to shift the monostable gear selector into PARK prior to exiting the vehicle constitutes a defect presenting a risk to motor vehicle safety."[14]

25. Despite the voluntary recall, upon information and belief, FCA has not identified a concrete timeline for when it will actually develop and implement a fix for the rollaway safety hazard. The most FCA can currently offer is its desire to "finalize a remedy by the 4th quarter of 2016,"[15] more than a year after the NHTSA began to investigate the rollaway issue. Thus, in

---

[12] http://www.nytimes.com/2015/09/30/business/fiat-chrysler-concedes-violating-rule-on-reporting-death-and-injury-claims.html (last accessed July 11, 2016)
[13] http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM528576/INCLA-EA16002-8352.PDF (last accessed July 11, 2016).
[14] http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM514210/RCLRPT-16V240-3644.PDF (last accessed July 11, 2016).
[15] http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM519776/RCMN-16V240-2694.pdf (last accessed July 11, 2016).

14

derogation of its a so-called commitment to vehicle safety, FCA's lack of urgency is business as usual when confronted with important vehicle safety issues.

26.    With each day that FCA failed to properly notify customers about the safety issues created by the E-shift System, with each day that FCA failed to initiate an aggressive recall campaign to remove the Defective Vehicles from the road, and with each day that FCA fails to implement a fix to remedy the rollaway safety issue, almost one million customers in the United States are at risk of experiencing a rollaway incident like those already experienced by hundreds of other Defective Vehicle owners.

## PLAINTIFFS' EXPERIENCE

27.    Plaintiffs Edith and Glen Harbin, who are residents of Crossville, Cumberland County, Tennessee, purchased their new 2014 Jeep Grand Cherokee Limited Diesel from Mountain Valley Motors, an authorized Jeep dealership and service center located in Blue Ridge, Fannin County, Georgia. Their vehicle has under 36,000 miles on it and is still covered by Jeep's standard 3-Year/36,000-mile Warranty.

28.    When the new 2014 Jeep Grand Cherokees first came out, Mr. Harbin researched this vehicle well. He was especially interested in the quality and safety features of the Jeep, and he relied upon the information that was publically available at the time in deciding to purchase this vehicle. The Harbins also reviewed and relied upon information that was relayed to them during their purchase at the authorized Jeep dealership.

29.    At the time of their purchase, neither the dealership nor FCA and its agents relayed any information about the Defect or about a recall involving the rollaway safety issue.  They were provided no information about a recall related to the rollaway safety issue, nor were they forewarned of the vehicle's propensity to roll away.

15

30.     On January 2, 2015 Plaintiff Edith Harbin, a safe driver with more than 40 years of driving experience, attempted to place the vehicle in Park while parking in front of their residence. Because of the defective E-shift System, the vehicle did not properly shift into Park and it began to rollaway, knocking her to the ground, running over her leg, and injuring her. The car eventually hit the Harbin's fence, which cost approximately $700 to repair.

31.     At the emergency room Mrs. Harbin was diagnosed with and treated for a broken elbow, bruising and a laceration on her head. Her leg was badly bruised but not broken. Mrs. Harbin was treated for her injuries but still suffers lasting effects caused by the rollaway incident.

32.     About a week following this incident, Mrs. Harbin contacted the customer service number for Chrysler Jeep to notify the company about the issue, but they were "not too interested" and offered no solutions to the vehicle's defect or the Harbins' physical and financial injuries.

33.     As a result of the rollaway, Plaintiffs' Defective Vehicle was damaged, for which the Harbins were forced to pay their $1000 deductible out of pocket to repair. In addition, they have incurred medical expenses related to Mrs. Harbin's injuries and the cost to repair their fence.

34.     Had the Harbins known of the defective nature of their Chrysler Jeep Grand Cherokee, they would not have purchased the vehicle or would have paid less for it. They have not received the benefit of their bargain.

## V.     CLASS ALLEGATIONS

35.     Plaintiffs bring this action against FCA both individually and as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on their own behalf and on behalf of the following Class:

>    Nationwide Class: All persons in the United States who purchased or leased a Defective Vehicle.

16

36.     Alternatively, or in addition to the Nationwide Class, Plaintiffs also bring claims pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the following subclasses:

> <u>Tennessee Subclass</u>: All persons in Tennessee who own, purchased or leased a Defective Vehicle.

> <u>Georgia Subclass</u>: All persons in Georgia who own, purchased or leased a Defective Vehicle.

37.     Excluded from the Class and Subclasses are: (a) any Judge or Magistrate presiding over this action, and members of their families; (b) FCA and any entity in which FCA has a controlling interest, or which has a controlling interest in FCA; (c) the officers, directors, or employees of FCA; (d) FCA's legal representatives, assigns, and successors; and (e) all persons who properly execute and file a timely request for exclusion from any Court-approved class.

38.     Plaintiffs meet the prerequisites of Rule 23(a) to bring this action on behalf of the Class.

39.     <u>Numerosity</u>: While the exact number of Class members cannot be determined yet, the Class and Subclasses consist of hundreds of thousands of people dispersed throughout the United States. The exact number of Class and Subclass members can be determined upon review of sales information and other records maintained by FCA. The members of the Class and Subclasses are therefore so numerous that joinder of all members is impracticable.

40.     <u>Commonality</u>: Common questions of law and fact exists as to all members of the Class and Subclasses. Among the questions of law and fact common to the Class and Subclasses are:

> a.  Whether the Defective Vehicles designed and/or sold by FCA possess a material defect;

> b.  Whether the E-shift System created an unreasonable risk that the Defective Vehicles would fail to properly park and begin to rollaway;

17

c.   Whether FCA knew, or should have known, that the Defective Vehicles were defective when it placed the Defective Vehicles into the stream of commerce;

d.   Whether FCA fraudulently concealed the defect from consumers;

e.   Whether FCA breached express warranties relating to the Defective Vehicles;

f.   Whether FCA breached implied warranties of merchantability relating to the Defective Vehicles;

g.   Whether the defective E-shift System resulted from FCA's negligence;

h.   Whether FCA is strictly liable for selling the Defective Vehicles;

i.   Whether Plaintiffs and Class members are entitled to damages, including compensatory, exemplary, and statutory damages;

j.   Whether Plaintiffs and Class members are entitled to replacement or repair of their Defective Vehicles; and

k.   Whether Plaintiffs and Class members are entitled to equitable relief, including an injunction requiring that FCA engage in a corrective notice campaign and/or a recall.

41.   <u>Typicality</u>:  Plaintiffs have the same interest in this matter as all other members of the Class and Subclass, and Plaintiffs' claims arise out of the same set of facts and conduct by FCA as the claims of all the other members of the Class and Subclass. Plaintiffs and members of the Class and Subclasses own or lease a Defective Vehicle designed and/or manufactured by FCA that contains a uniform Defect that makes them immediately dangerous upon purchase. The defective E-shift System causes the Defective Vehicles to rollaway after the driver exits the vehicle with the engine still running by providing inadequate feedback as to whether the driver has fully shifted the transmission to Park. The claims of Plaintiffs and the members of the Class and Subclasses arise out of FCA's placement into the marketplace of a defective product that created a significant safety risk to consumers, and from FCA's failure to disclose that known safety risk to Plaintiffs and the members of the Class and Subclass. FCA's conduct in designing,

18

manufacturing, marketing, advertising, warranting, and/or selling the Defective Vehicles, in addition to FCA's conduct in concealing their defective nature, is also common to Plaintiffs and the Class and Subclass's claims.

42.     Adequacy of Representation:  Plaintiffs are committed to pursuing this action and has retained competent counsel experienced in consumer and product liability class action litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the Class and Subclass. Plaintiffs' claims are coincident with, and not antagonistic to, those of the other members of the Class and Subclasses they seek to represent. Plaintiffs have no disabling conflicts with the any members of the Class or Sub-classes, and they will fairly and adequately represent the interests of the members of the Class and Subclass.

43.     Injunctive/Declaratory Relief:  The elements of Rule 23(b)(2) are met. FCA will continue to commit the unlawful practices alleged herein, and the members of the Class and Subclasses and the general public will continue to remain at an unreasonable and serious personal safety risk as a result of the Defect. FCA has acted and refused to act on grounds that apply generally to the Classes, such that final injunctive relief and corresponding declaratory relief is appropriate respecting the Classes as a whole.

44.     Predominance: The elements of Rule 23(b)(3) are met. The common questions of law and fact enumerated above predominate over the questions affecting only individual members of the Classes, and a class action is the superior method for the fair and efficient adjudication of this controversy. The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources will be unnecessarily depleted by resolution of individual claims. Joinder on an individual basis of

19

hundreds or thousands of claimants in one suit would be impractical or impossible. Individualized rulings and judgments could result in inconsistent relief for similarly-situated plaintiffs. Plaintiffs' counsel, who are highly-experienced in class action litigation, foresee little difficulty in the management of this case as a class action.

## TOLLING OF THE STATUTES OF LIMITATIONS

45. The claims alleged herein accrued upon the discovery of the defective nature of the Defective Vehicles, which manifested itself when the Defective Vehicles began to rollaway after drivers exited the vehicles with the engine still running and intending to place the transmission in Park. Because the defect alleged herein is hidden, and, as described above, FCA failed to disclose the true character, nature, and quality of the Defective Vehicles, Plaintiffs and the Class and Sub-class members did not discover, and could not have discovered, the defect through reasonable and diligent investigation. Plaintiffs' own visual examination of the Defective Vehicles when purchased, as well as their initial use of the Defective Vehicles, did not immediately reveal the defective nature of the Defective Vehicles.

46. Any applicable statutes of limitations have been tolled by FCA's knowledge, misrepresentation, and/or concealment and denial of the facts as alleged herein. Plaintiffs and the Class and Sub-class members could not have reasonably discovered the true defective nature of the Defective Vehicles before the defect manifested itself, and FCA continues to conceal and/or misrepresent the existence of the defect. As a result of FCA's active concealment of the defect and/or failure to inform Plaintiffs and the Class and Sub-class members of the defect, any and all statutes of limitations otherwise applicable to the allegations herein have been tolled.

## VI.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**MAGNUSON-MOSS WARRANTY ACT**

**(15 U.S.C. § 2301, *et seq.*)**
**(On behalf of the Nationwide Class,**
**or alternatively, the Georgia Subclass)**

47.     Plaintiffs allege and incorporate by reference all paragraphs as though fully set forth herein.

48.     Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301(3).

49.     FCA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 230 (4)-(5).

50.     The Defective Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

51.     Under 15 U.S.C. § 2310(d)(1), the MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

52.     FCA's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Defective Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

53.     FCA breached these warranties. The Defective Vehicles are equipped with a defective E-shift System that fails to shift into gear and places drivers at risk of significant personal harm and property damage. The Defective Vehicles share a common design defect in that the E-shift System is defectively designed and creates an unreasonable risk of harm, contrary to FCA's representations about its vehicles. FCA's breach of warranty has deprived Plaintiffs and Class members of the benefit of their bargain.

54.     Plaintiffs and the Class members have had sufficient direct dealings with either FCA or its agents (*e.g.* dealerships and technical support) to establish privity of contract between

21

FCA, and the one hand, and Plaintiffs and the Class members on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the Class members are intended third-party beneficiaries of the contracts between FCA and its dealers, specifically, of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles. The warranty agreements were designed for and intended to benefit consumers, like Plaintiffs and the Class members, only.

55.    Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. FCA has had over a year to provide a suitable repair for the defective E-shift System and has done nothing but simply notify registered owners of the Defective Vehicles.

56.    At the time of sale or lease of each Defective Vehicle, FCA knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Defective Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure or afford FCA a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

57.    Plaintiffs and the Class members would suffer economic hardship if they returned their Defective Vehicles but did not receive the return of all payments made by them. Because FCA is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class members have not re-accepted their Defective Vehicles by retaining them.

58.     The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

59.     Plaintiffs, individually and on behalf of the Class members, seek all damages permitted by law, including diminution in value of the Defective Vehicles, in an amount to be proved at trial.

## SECOND CLAIM FOR RELIEF
### TENNESEE PRODUCT LIABILITY ACT
**(Tenn. Code. Ann. § 29-28-101, *et seq*.)**
**(On Behalf of the Nationwide class or,**
**alternatively, the Tennessee Subclass)**

60.     Plaintiffs re-allege the paragraphs above as if fully set forth herein.

61.     FCA had a duty to design and manufacture a product that would be safe for its intended and foreseeable uses and users, including the use to which its products were put by Plaintiffs and the Class members. FCA breached its duties to Plaintiffs and the Class members because they were negligent in the design, development, manufacture, and testing of the E-shift Systems installed in the Defective Vehicles, and FCA is responsible for this negligence. As of the time they were manufactured, the Defective Vehicles were defective and unreasonably dangerous to consumers like the Plaintiffs and Class members.

62.     FCA was negligent in the design, development, manufacture, and testing of the E-shift Systems installed in the Defective Vehicles because they knew, or in the exercise of reasonable care should have known, that the vehicles equipped with defective E-shift Systems pose an unreasonable risk of serious bodily injury to Plaintiffs and Class members, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents, such as

those described above, in which the E-shift Systems fail to properly engage the vehicles in "Park" causing it to rollaway.

63.     FCA owed Plaintiffs and the classes a duty to provide thorough notice of known safety defects, such as the E-shift Systems' propensity to fail.

64.     Once it discovered the E-shift Systems' propensity to fail, FCA also owed Plaintiffs and the proposed classes a duty to ensure that an appropriate repair procedure was developed and made available to consumers.

65.     FCA owed also Plaintiffs and the proposed classes a duty not to engage in fraudulent or deceptive conduct, including the knowing concealment of material information such as the E-shift Systems' propensity to fail. This duty is independent of any contractual duties FCA may owe or have owed.

66.     Under the TREAD Act, FCA owed an independent duty to send notice to Class Vehicle owners, purchasers, and dealers whenever it "learns the vehicle or equipment contains a defect and decides in good faith that the defect is related to motor vehicle safety." 49 U.S.C. § 30118(c). Despite FCA's awareness of the E-shift System defect, it failed to timely notify owners, purchasers, and dealers. This duty is independent of any contractual duties FCA may owe or have owed to them.

67.     A finding that FCA owed a duty to Plaintiffs and the classes would not significantly burden FCA. FCA has the means to efficiently notify drivers of Defective Vehicles about dangerous defects. The cost borne by FCA for these efforts is insignificant in light of the dangers posed to Plaintiffs and the class by FCA's failure to disclose the E-shift System defect and provide an appropriate notice and repair.

68.     FCA's failure to disclose the defect in Defective Vehicles to consumers and NHTSA is a departure from the reasonable standard of care. Accordingly, FCA breached its duties to Plaintiffs and the classes.

69.     As designed the Defective Vehicles are both defective and unreasonably dangerous and were so at the time they were manufactured. Therefore, FCA is strictly liable to Plaintiffs and Class members.

70.     FCA's conduct was contrary to public policy favoring the disclosure of defects that may affect customer safety; these policies are embodied in the TREAD Act, and the notification requirements in 49 C.F.R. § 573.1, *et seq*.

71.     As a direct, reasonably foreseeable, and proximate result of FCA's failure to exercise reasonable care to inform Plaintiffs and the class about the defect or to provide appropriate repair procedures for it, Plaintiffs and the Class members have suffered damages in that they spent more money than they otherwise would have on Defective Vehicles which are of diminished value.

72.     Plaintiffs and the Class members could not have prevented the damages caused by FCA's negligence through the exercise of reasonable diligence. Neither Plaintiffs nor the Class members contributed in any way to FCA's failure to provide appropriate notice and repair procedures.

73.     Plaintiffs and the class seek to recover the damages caused by FCA. Because FCA acted fraudulently and with wanton and reckless misconduct, Plaintiffs also seek an award of punitive damages.


**THIRD CLAIM FOR RELIEF**
**BREACH OF EXPRESS WARRANTY**

**(O.C.G.A. § 11-2-313)**
**(On Behalf of the Nationwide class or,**
**alternatively, the Georgia Subclass)**

74.     Plaintiffs re-allege the paragraphs above as if fully set forth herein.

75.     FCA provided all purchasers and lessees of the Defective Vehicles with the express warranties described herein, which became part of the basis of the bargain. Accordingly, FCA's warranties are express warranties under state law.

76.     The parts affected by the defect, including the E-shift Systems, were manufactured and distributed by FCA in the Defective Vehicles and are covered by the warranties FCA provided all purchasers and lessors of Defective Vehicles.

77.     FCA breached these warranties by selling and leasing Defective Vehicles with the defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

78.     Plaintiffs notified FCA of the breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breach of written warranty would have been futile. FCA also knows of the defect and yet has chosen to conceal it and to fail to comply with their warranty obligations.

79.     As a direct and proximate cause of FCA's breach, Plaintiffs and the other Class members bought or leased Defective Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Defective Vehicles suffered a diminution in value. Plaintiffs and Class members have also incurred and will continue to incur costs for repair and replacement of defective E-shift Systems and damage resulting from its failure.

80.    FCA's attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, FCA's warranty limitation is unenforceable because they knowingly sold Defective Vehicles without informing consumers about the defect.

81.    The time limits contained in FCA's warranty period were also unconscionable and inadequate to protect Plaintiffs and members of the Class. Among other things, Plaintiffs and Class members had no meaningful choice in determining these time limitations the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and the Class members, and FCA knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

82.    Plaintiffs and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of FCA's conduct described herein. Plaintiffs and the other proposed Class members are entitled to legal and equitable relief against FCA, including damages, consequential damages, specific performance, attorney fees, costs of suit, and other relief as appropriate.

### FOURTH CAUSE OF ACTION
### BREACH OF IMPLIED WARRANTY
### (O.C.G.A. § 11-2-314)
### (On Behalf of the Nationwide class or,
### alternatively, the Georgia Sub-class)

83.    Plaintiffs re-allege the paragraphs above as if fully set forth herein.

84.    FCA is and was at all relevant times a merchant with respect to the Defective Vehicles.

85.    FCA was and is in actual or constructive privity with all Plaintiffs and all Class Members.

27

a. Plaintiffs had and continue to have sufficient direct dealings with FCA and/or its authorized dealers, franchisees, representatives, and agents to establish any required privity of contract. FCA's authorized dealers, franchisees, representatives, and agents were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles. The warranty agreements were designed for and intended to benefit only the ultimate purchasers and lessees of the Defective Vehicles, *i.e.*, Plaintiffs and Class members.

b. Privity is not required to assert this claim because Plaintiffs and the Class members are intended third-party beneficiaries of contracts between FCA and its dealers, franchisees, representatives, and agents.

c. By extending express written warranties to end-user purchasers and lessees, FCA brought itself into privity with all Plaintiffs and Class members.

86. At all times relevant hereto, applicable law imposed upon FCA a duty that the E-shift Systems installed in the Defective Vehicles be fit for the ordinary purposes for which they are used and that they pass without objection in the trade under the contract description.

87. FCA has not validly disclaimed, excluded, or modified the implied warranties or duties described above, and any attempted disclaimer or exclusion of the implied warranties was and is ineffectual.

88. The E-shift Systems installed in the Defective Vehicles were defective at the time they left the possession of FCA, as set forth above. FCA knew of this defect at the time the purchase

28

and lease transactions occurred. Thus, the E-shift Systems installed in the Defective Vehicles, when sold and at all times thereafter, were not in merchantable condition or quality because they are not fit for their ordinary intended purpose and they do not pass without objection in the trade under the contract description.

89.     Plaintiffs and Class members used the E-shift Systems installed in the Defective Vehicles in a manner consistent with their intended use and performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of FCA or by operation of law in light of FCA's unconscionable conduct.

90.     FCA had actual knowledge of, and received timely notice regarding, the defect at issue in this litigation and, notwithstanding such notice, failed and refused to offer an effective remedy.

91.     In addition, FCA received, on information and belief, numerous complaints and other notices from customers advising of the defect associated with the E-shift Systems installed in the Defective Vehicles.

92.     By virtue of the conduct described herein and throughout this Complaint, FCA breached the implied warranty of merchantability.

93.     As a direct and proximate result of FCA's breach of warranties, Plaintiffs and Class members suffered economic damage, including loss attributable to the diminished value of their Defective Vehicles, loss of use of their Defective Vehicles and other tangible property, as well as the monies spent and to be spent to repair and/or replace their E-shift Systems.

### FIFTH CLAIM FOR RELIEF
### BREACH OF EXPRESS WARRANTY
**(Tenn. Code Ann. § 47-2-313)**
**(On Behalf of the Tennessee Subclass)**

94.     Plaintiffs re-allege the paragraphs above as if fully set forth herein.

95.     FCA provided all purchasers and lessees of the Defective Vehicles with the express warranties described herein, which became part of the basis of the bargain. Accordingly, FCA's warranties are express warranties under state law.

96.     The parts affected by the defect, including the E-shift Systems, were manufactured and distributed by FCA in the Defective Vehicles and are covered by the warranties FCA provided all purchasers and lessors of Defective Vehicles.

97.     FCA breached these warranties by selling and leasing Defective Vehicles with the defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

98.     Plaintiffs notified FCA of the breach within a reasonable time, and/or was not required to do so because affording FCA a reasonable opportunity to cure its breach of written warranty would have been futile. FCA also knows of the defect and yet has chosen to conceal it and to fail to comply with their warranty obligations.

99.     As a direct and proximate cause of FCA's breach, Plaintiffs and the other Class members bought or leased Defective Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Defective Vehicles suffered a diminution in value. Plaintiffs and Class members have also incurred and will continue to incur costs for repair and replacement of defective E-shift Systems and damage resulting from its failure.

100.    FCA's attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, FCA's warranty

30

limitation is unenforceable because they knowingly sold Defective Vehicles without informing consumers about the defect.

101.     The time limits contained in FCA's warranty period were also unconscionable and inadequate to protect Plaintiffs and members of the Class. Among other things, Plaintiffs and Class members had no meaningful choice in determining these time limitations the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and the Class members, and FCA knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

102.     Plaintiffs and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of FCA's conduct described herein. Plaintiffs and the other proposed Class members are entitled to legal and equitable relief against FCA, including damages, consequential damages, specific performance, attorney fees, costs of suit, and other relief as appropriate.

**SIXTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY**
**(Tenn. Code Ann. § 47-2-314)**
**(On Behalf of the Tennessee Sub-class)**

103.     Plaintiffs re-allege the paragraphs above as if fully set forth herein.

104.     FCA is and was at all relevant times a merchant with respect to the Defective Vehicles.

105.     FCA was and is in actual or constructive privity with all Plaintiffs and all Class Members.

d.     Plaintiffs had and continue to have sufficient direct dealings with FCA and/or its authorized dealers, franchisees, representatives, and agents to

establish any required privity of contract. FCA's authorized dealers, franchisees, representatives, and agents were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles. The warranty agreements were designed for and intended to benefit only the ultimate purchasers and lessees of the Defective Vehicles, *i.e.*, Plaintiffs and Class members.

e.     Privity is not required to assert this claim because Plaintiffs and the Class members are intended third-party beneficiaries of contracts between FCA and its dealers, franchisees, representatives, and agents.

f.     By extending express written warranties to end-user purchasers and lessees, FCA brought itself into privity with all Plaintiffs and Class members.

106.   At all times relevant hereto, applicable law imposed upon FCA a duty that the E-shift Systems installed in the Defective Vehicles be fit for the ordinary purposes for which they are used and that they pass without objection in the trade under the contract description.

107.   FCA has not validly disclaimed, excluded, or modified the implied warranties or duties described above, and any attempted disclaimer or exclusion of the implied warranties was and is ineffectual.

108.   The E-shift Systems installed in the Defective Vehicles were defective at the time they left the possession of FCA, as set forth above. FCA knew of this defect at the time the purchase and lease transactions occurred. Thus, the E-shift Systems installed in the Defective Vehicles, when sold and at all times thereafter, were not in merchantable condition or quality because they

32

are not fit for their ordinary intended purpose and they do not pass without objection in the trade under the contract description.

109.    Plaintiffs and Class members used the E-shift Systems installed in the Defective Vehicles in a manner consistent with their intended use and performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of FCA or by operation of law in light of FCA's unconscionable conduct.

110.    FCA had actual knowledge of, and received timely notice regarding, the defect at issue in this litigation and, notwithstanding such notice, failed and refused to offer an effective remedy.

111.    In addition, FCA received, on information and belief, numerous complaints and other notices from customers advising of the defect associated with the E-shift Systems installed in the Defective Vehicles.

112.    By virtue of the conduct described herein and throughout this Complaint, FCA breached the implied warranty of merchantability.

113.    As a direct and proximate result of FCA's breach of warranties, Plaintiffs and Class members suffered economic damage, including loss attributable to the diminished value of their Defective Vehicles, loss of use of their Defective Vehicles and other tangible property, as well as the monies spent and to be spent to repair and/or replace their E-shift Systems.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court enter a judgment awarding the following relief:

   a.    An order certifying the proposed class(es), and appointing Plaintiffs and their counsel to represent the class(es);

b.       An order awarding Plaintiffs and the Class members their actual damages, punitive damages, and/or any other form of monetary relief provided by law;

c.       An order awarding Plaintiffs and the class(es) restitution, disgorgement, or other equitable relief as the Court deems proper;

d.       An order requiring FCA to adequately disclose and repair the defect;

e.       An order awarding Plaintiffs and the class(es) pre-judgment and post-judgment interest as allowed under the law;

f.       An order awarding Plaintiffs and the class(es) reasonable attorney fees and costs of suit, including expert witness fees; and

g.       An order awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: July 29, 2016                Respectfully submitted,

By: *s/Gregory F. Coleman*
     Gregory F. Coleman, TN Bar #014092
     Lisa A. White, TN Bar #026658
     Mark E. Silvey, TN Bar #03415
     Adam E. Edwards, TN Bar #023253
     **GREG COLEMAN LAW PC**
     First Tennessee Plaza
     800 S. Gay Street, Suite 1100
     Knoxville, Tennessee 37929
     Telephone: 865-247-0080
     Facsimile: 865-533-0049
     greg@gregcolemanlaw.com
     lisa@gregcolemanlaw.com
     mark@gregcolemanlaw.com
     adam@gregcolemanlaw.com

Edward A. Wallace (*pro hac vice pending*)
Amy E. Keller (*pro hac vice pending*)
**WEXLER WALLACE LLP**
55 W. Monroe St., Ste. 3300
Chicago, Illinois 60603
Tel: 312-346-2222
Fax: 312-346-0022
eaw@wexlerwallace.com
aek@wexlerwallace.com

John A. Yanchunis (*pro hac vice pending*)
**MORGAN & MORGAN, P.A.**
201 North Franklin St., 7th Floor
Tampa, Florida 33602
Tel. 813.223.5505
Fax 813-223-5402
jyanchunis@forthepeople.com

*Attorneys for Plaintiffs*

35